735 F.2d 653
 SAM WONG & SON, INC., a Corporation, on behalf of itself and
all others similarly situated, Plaintiffs-Appellants,
v.
NEW YORK MERCANTILE EXCHANGE; Richard B. Levine; Howard
Gabler; Melvyn Falis; Jayne Ball; Alfred S. Pennisi;
Peter Johnston; Michel Marks; Victor Buccellato;
Salvatore Calcaterra; Horace De Podwin; Sam Fishberg;
Richard Jarecki; Stanley Meierfeld; Charles Miller; Henry
Polan; Jack Schwager; Ira Shein; Jacob Stern; Dennis
Suskind; Sol Tanne; Harvey Wachman; Norton Waltuck; Joe
Doe; Jane Roe; Richard Coe; Mary Smith; ABC, Inc.; DEF,
Inc.; GHI, Inc.; JKL, Inc.; MNO, Inc.; and PQR, Inc.
(the last ten names being fictitious), Defendants-Appellees.
Anthony SPINALE, Plaintiff-Appellant,
v.
NEW YORK MERCANTILE EXCHANGE, Michel Marks, Dennis Suskind,
Sal Calcaterra, Norton Waltuck, George Gero, Stanley
Meierfeld, Horace De Podwin, Jack Schwager, Sam Fishberg,
Ira Shein, Jack Place, Harvey Wachman, and Charles Miller,
Defendants-Appellees.
 Nos. 894, 895, Dockets 83-7885, 83-7891.
 United States Court of Appeals,
Second Circuit.
 Argued March 12, 1984.
Decided May 11, 1984.
 
 Wayne D. Greenstone, Greenstone & Greenstone, P.A., and Kirsten, Friedman & Cherin, Newark, N.J., for plaintiff-appellant Sam Wong & Son, Inc.
 Richard A. Miller, Cadwalader, Wickersham & Taft, and Newman, Tannenbaum, Helpern & Hirschtritt, New York City, for plaintiff-appellant Anthony Spinale.
 William E. Hegarty, Henry G. Bisgaier, Peter Leight, Cahill Gordon & Reindel, New York City, and Charles S. Horgan, General Counsel, New York Mercantile Exchange, for defendants-appellees.
 Kenneth M. Raisler, Gen. Counsel, Commodity Futures Trading Com'n, Pat G. Nicolette, Deputy Gen. Counsel, Whitney Adams, Deputy Gen. Counsel, Nancy E. Yanofsky, Atty., Washington, D.C., for Commodity Futures Trading Commission, amicus curiae.
 Baer Marks & Upham, New York City Mark A. Buckstein, Barry J. Mandel, William A. Brandt, Jr., New York City, of counsel, for Commodity Exchange, Inc., amicus curiae.
 Kirkland & Ellis, Chicago, Ill. (John E. Angle, T. Webster Brenner, John H. Stassen, Chicago, Ill., of counsel), for the Board of Trade of the City of Chicago, amicus curiae.
 James M. Bruchs, Chicago, Ill., for the MidAmerica Commodity Exchange, amicus curiae.
 Dorsey & Whitney, Minneapolis, Minn. (James H. O'Hagan, Minneapolis, Minn., of counsel), for the Minneapolis Grain Exchange, amicus curiae.
 Freeman, Freeman & Salzman, P.C., Chicago, Ill. (Jerrold E. Salzman, Lee A. Freeman, Jr., Chicago, Ill., of counsel), for the Chicago Mercantile Exchange, amicus curiae.
 Barrett Smith Schapiro Simon & Armstrong, New York City (Edmund R. Schroeder, New York City, of counsel), for Coffee, Sugar & Cocoa Exchange, Inc. and New York Futures Exchange, Inc. amici curiae.
 Shughart, Thomson & Kilroy, Overland Park, Kan. (William B. Jensen, Overland Park, Kan., of counsel), for Board of Trade of Kansas City, Missouri, Inc., amicus curiae.
 Rein Mound & Cotton, New York City (Maurice Mound, New York City, of counsel), for New York Cotton Exchange, amicus curiae.
 Before FRIENDLY, TIMBERS and MESKILL, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 We have here appeals by plaintiffs, Sam Wong & Son, Inc. (Wong) and Anthony Spinale, in two suits in the District Court for the Southern District of New York against the New York Mercantile Exchange (NYME or Exchange), its Board of Governors (the Board), and various NYME officers. Both suits concern action or inaction by the NYME relating to the March, April and May 1979 Maine round white potato futures contracts. After an all night meeting on March 8-9, 1979, the Board declared that, in consequence of large-scale failures of the March potatoes to meet delivery standards at the Hunts Point Terminal Market in the Bronx, New York, a market emergency existed with respect to the three contracts, suspended trading in the April and May contracts,[1] and ordered those contracts to be liquidated at the March 8 settlement price. The Board also ordered a two-day extension in the delivery period for the March contracts and provided that unfulfilled March contracts would be settled at a price to be determined by a special committee.
 
 
 2
 Wong's complaint, filed on behalf of himself and "all other producers, owners, processors or merchandizers [sic] of 1978 crop year potatoes grown in the United States who assumed short positions" in the 1979 Maine Potato contracts to hedge against a decline in the value of their crops,[2] made two principal claims. One was that, once the delivery problem had manifested itself in November, 1978, the NYME had failed to take proper action earlier than March 8-9. The other was that the NYME had failed in a duty to revise the Maine round white potato futures contract so that it would be a better vehicle for hedging and less susceptible to the problem that had developed in 1976[3] and again in the controversy here before us. Spinale held net long positions in the March, April and May contracts;[4] he attacked the action taken at the March 8-9 meeting, which had deprived him of further profits he would have obtained if the NYME had not acted or had acted less drastically. His complaint, almost the exact opposite of Wong's, was that the Exchange should not have taken emergency action when it did, and alternatively that any action should have been less drastic and should not have included the March contract, see supra note 1. Judge Sofaer, in a comprehensive and scholarly opinion, reported sub nom. Jordon v. New York Mercantile Exchange, 571 F.Supp. 1530 (S.D.N.Y.1983), familiarity with which is assumed, directed that Wong's complaint should be dismissed for failure to state a claim on which relief can be granted, Fed.R.Civ.P. 12(b)(6), or, alternatively, that summary judgment should be granted to defendants under Fed.R.Civ.P. 56. He also granted summary judgment dismissing Spinale's complaint. These appeals followed.
 
 The Facts[5]
 
 3
 The NYME Maine Round White Potato Futures Contract calls for the delivery of 500 cwt. (hundredweight) of Maine grown potatoes of any but the Cobbler and Warba varieties, which are excluded because of their irregular shapes. The contract requires the potatoes to be packaged in 1000 fifty-pound bags. Delivery months are November, March, April and May. The Maine potato crop is harvested in the fall; thus the November contract marks the beginning of the crop year. Delivery may be made by rail or truck. In fact all deliveries have been made by truck since this was first permitted in the May 1977 contract. Each delivery generally consists of one truckload of potatoes, i.e., the contract amount of 50,000 pounds. The potatoes must grade U.S. No. 1 for par delivery, except that for the April and May contracts "commercials" are deliverable at a 25% discount from the settlement price for the last trading day of the delivery month. The contract requires two inspections--one by a federally-authorized state inspector at the point of origin in Maine and the other by a federal inspector at the final point of destination at the Hunts Point Terminal Market, the Bronx, New York, or Everett, Massachusetts. The grading standard follows the United States Standards for Grade of Potatoes promulgated by the Secretary of Agriculture.
 
 
 4
 The first deliveries of Maine round white potatoes for the 1978-1979 crop year began for the NYME on November 6, 1978 and continued until November 20. An open interest of ninety-two contracts remained after the termination of trading in the November 1978 contract. Ultimately deliveries were tendered to close fifty contracts; the remaining contracts were liquidated pursuant to the Exchange's "EFP" procedure, see infra. Of the fifty deliveries, all of which had passed inspection in Maine, fifteen failed to pass inspection at Hunts Point.[6] Eleven loads failed because of apparent deterioration since inspection in Maine; the potatoes arrived at Hunts Point with high percentages of sunken and discolored areas that exceeded the Department of Agriculture's (USDA) specifications for the U.S. No. 1 grade. The other four failures were "reversals" based on grading characteristics that should have been detected at the point of origin.
 
 
 5
 The November rejections prompted the NYME to take a look. On November 21 the Exchange's Potato Control Subcommittee (Control Committee) reviewed the results of the delivery period and tentatively concluded that "no problems were foreseeable". Nevertheless, the Control Committee recommended sending a letter to the USDA relating to the inspection reversals and failures. On December 14, Richard Levine, president of the NYME, wrote such a letter to a USDA official, Ligon Johnson, head of the Grading Section, Fresh Products Branch of the Fresh Fruit and Vegetable Quality Division, in Washington, D.C., specifically asking an opinion on how the delivery problem arose and whether similar difficulties would occur in the future. After conducting a preliminary investigation, Johnson responded on January 18, 1979. He commented that apparently "this year's crop of Maine potatoes, even after being sorted, have [sic] a higher than usual percentage of borderline defective specimens." Regarding the inspection reversals, he assured Levine that steps had been taken to bring about uniformity in inspectors' grading standards. Lastly, he tried to assuage any of the Exchange's concerns by stating that the USDA was "prepared to take additional action if necessary to prevent a recurrence of the embarrassment encountered this past November."
 
 
 6
 During January and February, 1979 the NYME continued to monitor the situation with respect to the Maine potato crop and the 1979 futures contracts. Notwithstanding its initial concern over the November deliveries, the NYME concluded that this was not a serious portent. The Control Committee reconvened on January 29 to discuss the USDA's response; the group was concerned primarily with the discrepancies between the Maine and New York inspections, a problem which the USDA appeared to have under control. Neither the Control Committee nor the Board at its regular February meeting focused much attention on the quality of the year's potato crop. Exchange officials knew from experience, however, that farmers may have a tendency to be more lax in their own grading standards with respect to potatoes sold and delivered early in the season. Moreover, both the NYME's field representative in Maine and its monitoring staff based in New York reported during this period that there was a sufficient deliverable supply of potatoes.[7] As described by the CFTC report, during January and February, 1979, "with the November experience behind it, neither the Control Subcommittee nor the Board requested the Exchange staff to do anything other than their usual monitoring. Nor was anything other than the usual monitoring undertaken."
 
 
 7
 What followed is best presented by the description in the CFTC report:
 
 
 8
 During the week of March 5-8, 1979, the Exchange was faced with the failure of 29 out of 32 loads presented for the point of destination inspection in Hunts Point for condition defects, primarily sunken and discolored areas.... The April and May, 1979 contracts had closed on Friday, March 2, at $6.30 and $7.03, respectively. The close of trading on Thursday, March 8, found April at $7.60 and May at $8.14. In contrast, the cash price at Hunts Point for this period remained steady at $5.85. During these four days, the open interests in the May contract declined by nearly 3,000 to 10,000 contracts. Trading in both contracts locked up the limit of 50 cents on Monday and touched the limit on Wednesday. Otherwise, the market traded freely. (Emphasis supplied).[8]
 
 
 9
 As the delivery failures unfolded during the week, the NYME made efforts to obtain information. Apart from utilizing its own staff, the Exchange contacted officials at the USDA, spoke with traders who were short hedgers, clearing members and representatives of the Maine potato industry, and consulted with the CFTC.
 
 
 10
 The NYME's discussions with the USDA focused on whether the Maine and New York inspectors were applying different standards. Although a definitive answer was not possible under such time pressures, the USDA found nothing to indicate inspection inconsistencies. Faced with the fact that potatoes making the grade in Maine failed inspection in New York, an unusual circumstance because the truck route lasted only twelve to eighteen hours, the USDA thought an explanation might be found in the crop's quality.
 
 
 11
 On Tuesday, March 6, the Administrative Committee of the NYME held an unusual meeting with a short hedger. The Committee customarily chose not to hear individual matters. The trader, who was well respected in the market, stated that he was making every effort to obtain good deliverable potatoes but was having difficulty in doing so. Subsequently, another trader notified the Exchange of his delivery problems. In addition, the NYME's field representative reported concerns expressed by members of the Maine potato industry over the recent delivery rejections.
 
 
 12
 The NYME was also in contact with the CFTC about the problem and what, if anything, should be done about it. Various courses of action were discussed back and forth, including the issuance of public statements by both organizations and the possibility of joint emergency action.[9]
 
 
 13
 By the evening of Thursday, March 8, the Exchange staff had become convinced that the real problem was with the quality of the crop and that any inspection inconsistencies should be discounted.[10] If this was so, the situation could fairly be expected to worsen as the season advanced. The NYME staff was considering various emergency actions such as modifying the terms of delivery, temporary suspension of trading, increasing margins to 100% and directing that trading be limited to liquidation of existing contracts. Although the Exchange's Maine field liaison had suggested to Levine to have the NYME stand pat, this idea was not seriously discussed.
 
 
 14
 In a telephone conversation late in the afternoon of March 8, Michel Marks, the chairman of the NYME, told Gary Seevers, the acting chairman of the CFTC, that he had considered calling the Board into session the following day to discuss the potato situation but deemed it to be so serious that he had decided instead to convoke the Board that evening. Apart from the immediate March delivery problem, the Exchange was concerned with maintaining viable futures contracts for April and May, i.e., those that reflect the real economic value of the potato crop. The meeting began at 9:15 p.m. on Thursday and lasted until 4:30 a.m. on Friday. Eleven of the fifteen governors were present as were the Exchange's president Levine, outside counsel and the Board's chairman emeritus. Four of the governors, Chairman Marks, Sam Fishberg, Salvatore Calcaterra and Stanley Meierfeld, were considered to be especially knowledgeable about the potato market.
 
 
 15
 President Levine began the meeting with a report reproduced in the margin.[11] After examination of reports of inspection on the March deliveries and information with respect to past inspection failures presented by the Clearing House Manager, the Board considered the question of possible conflicts of interest, with results indicated in the margin.[12] The abbreviated minutes of the meeting recite that after extensive discussion which "focused on the unusually high rate of failure of inspections in New York and the inability of potatoes to meet the contracts' standards" and advice from counsel, the Board adopted a series of resolutions.[13] One, which was passed unanimously, declared that "an emergency exists which threatens or may threaten the fair and orderly trading in and the liquidation of and delivery under the April 1979 and May 1979 Round White Potato Futures Contract[s] which emergency requires immediate action." A second, adopted by eight of the members present, with three abstaining, resolved that trading in the April and May 1979 contracts shall be suspended and that all open contracts be liquidated at a settlement price of $7.60 per cwt. for the April contract and $8.14 per cwt. for the May contract, these being the settlement prices at the close of trading on March 8, 1979. A third resolution, adopted by a vote of nine of the eleven members present, with two abstaining, declared the existence of an emergency requiring immediate action with respect to the March 1979 contract. Two further resolutions were adopted concerning the March contract by a vote of eight of the ten members present;[14] one member abstained and another voted in the negative. One resolution extended for two days, until March 23, the delivery period for the March contract; the other provided that with regard to all March contracts not fulfilled by delivery on March 23, the sellers shall be deemed not to have failed to perform and the contracts shall be liquidated at a settlement price to be determined by the Exchange. A special committee of three outside experts later fixed this at $6.34 per cwt., the settlement price of the March contract at the close of trading on February 28, 1979; the NYME adopted the committee's recommendation on May 23, 1979.
 
 
 16
 Pursuant to CFTC regulation 1.41(f)(2), 17 C.F.R. Sec. 1.41(f)(2), discussed infra, the NYME, on Friday morning, March 9, promptly notified the Commission of the emergency resolutions adopted during the night. On March 19, the Exchange furnished the Commission with a written explanation of the emergency and the action taken to meet the problem; the Exchange thereafter supplemented this information by various correspondence over the next several months.[15]
 
 
 17
 The Relevant Statutes, Regulations of the CFTC and By-Laws
 
 
 18
 and Rules of the NYME
 
 
 19
 The Commodity Exchange Act (CEA), 7 U.S.C. Secs. 1 et seq., has been accurately described as a "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." H.R.Rep. No. 975, 93d Cong., 2d Sess. 1 (1974).[16] Section 5 of the CEA, 7 U.S.C. Sec. 7, authorizes and directs the CFTC to designate a board of trade as a " 'contract market' " "when, and only when, such board of trade complies with and carries out" the conditions and requirements listed in seven subparagraphs. One of these, Sec. 5(a), is that, unless otherwise approved by the CFTC, the board of trade shall be "located at a terminal market where any cash commodity of the kind specified in the contracts of sale of commodity for future delivery to be executed on such board is sold in sufficient volumes and under such conditions as fairly to reflect the general value of the commodity and the differences in value between the various grades of such commodity, and where there is available to such board of trade, official inspection service approved by the Secretary of Agriculture or the Commission for the purpose."[17] Another condition and requirement of contract market designation, Sec. 5(d), is that the board of trade "provides for the prevention of manipulation of prices and the cornering of any commodity by the dealers or operators upon such boards." A third relevant provision, Sec. 5(g), is that the board of trade "demonstrates that transactions for future delivery in the commodity for which designation as a contract market is sought will not be contrary to the public interest."[18]
 
 
 20
 Section 5a, 7 U.S.C. Sec. 7a, imposes duties on contract markets. We quote Sec. 5a(4), (8) and (10) in the margin.[19] Section 5a(12) requires the contract market to submit to the CFTC for its approval all by-laws, rules, regulations and resolutions which relate to terms and conditions in contracts of sale or other trading requirements except those relating to the setting of levels of margin. Also, of direct relevance here, it provides:
 
 
 21
 The Commission shall specify the terms and conditions under which a contract market may, in an emergency, as defined by the Commission, adopt a temporary rule dealing with trading requirements without prior Commission approval. In the event of such an emergency, as defined by the Commission, requiring immediate action, the contract market by a two-thirds vote of its governing board may place into immediate effect without prior Commission approval a temporary rule dealing with such emergency if it notifies the Commission of such action with a complete explanation of the emergency involved.[20]
 
 
 22
 Pursuant to the authority conferred by Sec. 8a(5), 7 U.S.C. Sec. 12a(5), the CFTC has adopted Regulation 1.41, 17 C.F.R. Sec. 1.41. Section 1.41(a)(4) broadly defines the term "emergency", as follows:
 
 The term "emergency" means:
 
 23
 (i) Any occurrence or circumstance specifically defined as an "emergency" by the rules of a contract market which have been submitted to the Commission pursuant to section 5a(12) of the Act; and
 
 
 24
 (ii) Any other occurrence or circumstance which, in the opinion of the governing board of the contract market, requires immediate action and threatens or may threaten such things as the fair and orderly trading in, or the liquidation of or delivery pursuant to any contract for the future delivery of a commodity or any commodity option on such contract market. Occurrences and circumstances which a governing board of a contract market may deem emergencies include, but are not limited to:
 
 
 25
 (A) Any manipulative activity or attempted manipulative activity;
 
 
 26
 (B) Any actual, attempted, or threatened corner, squeeze, congestion, or undue concentration of positions;
 
 
 27
 (C) Any circumstances which may materially affect the performance of contracts or commodity options traded on the contract market;
 
 
 28
 ....
 
 
 29
 (H) Any other unusual, unforeseeable and adverse circumstance with respect to which it is impracticable for the contract market to submit, in a timely fashion, a rule to the Commission for review under section 5a(12) of the Act.
 
 
 30
 Section 1.41(a)(6) provides, inter alia, that the requirement of a "two-thirds vote of a governing board" is satisfied by the affirmative vote of two or more persons constituting not less than two-thirds of the members of the governing board physically present and voting at a meeting at which a quorum of at least one-third of the members is physically in attendance. Section 1.41(f)(2) requires the contract market to notify the CFTC of the adoption of a temporary emergency rule by the fastest available means of communication and promptly thereafter to send the CFTC a written copy of the rule. Section 1.41(f)(3) provides, in pertinent part, that a temporary emergency rule may provide for actions necessary or appropriate to meet the emergency "including, but not limited to, such actions" as:
 
 
 31
 (i) Limiting trading to liquidation only, in whole or in part, or limiting trading to liquidation only except for new sales by parties who have the commodity to deliver pursuant to such sales;
 
 
 32
 (ii) Extending or shortening the expiration date for trading in contracts;
 
 
 33
 (iii) Extending the time of delivery;
 
 
 34
 ....
 
 
 35
 (v) Ordering the liquidation of contracts, the fixing of a settlement price or the reduction in positions;
 
 
 36
 ....
 
 
 37
 (viii) Suspending trading; and
 
 
 38
 (ix) Modifying or suspending any provision of the rules of the contract market.
 
 
 39
 Contract market emergency action may be overturned, modified or approved by the CFTC, see Sec. 8a(9), 7 U.S.C. Sec. 12a(9); CFTC regulation 1.41(f), 17 C.F.R. Sec. 1.41(f), but the CFTC seems to be at liberty simply to refrain from acting, as it did here, see supra note 15.
 
 
 40
 A number of by-laws and rules of the NYME, which were approved by the CFTC, are also relevant. By-law 23.14, subtitled "Emergency Powers", and approved by the CFTC pursuant to Sec. 5a(12) of the Act on April 29, 1977, declares in paragraph (A) that "[t]he Exchange shall have power to take action in an emergency as set forth in this section." Paragraph (B) defines "emergency" as follows:
 
 
 41
 As used in this section the term "emergency" means:
 
 
 42
 (1) Any occurrence or circumstance specifically defined as an emergency in a By-Law or Rule of the Exchange which has been approved by the Commodity Futures Trading Commission.
 
 
 43
 (2) Any occurrence or circumstance which, in the opinion of a governing body of the Exchange, as defined herein, requires immediate action and threatens or may threaten such things as the fair and orderly trading in, or the liquidation of or delivery pursuant to, any contract for the future delivery of a commodity on the Exchange. Occurrences and circumstances which a governing body of the Exchange, as defined herein, may deem emergencies, include, but are not limited to, those occurrences or circumstances which are set forth in the Regulations of the Commodity Futures Trading Commission which define an emergency.
 
 
 44
 Rule 60.12, approved by the CFTC on November 2, 1976, authorizes what is called the "EFP" (exchange of futures for product or exchange for physicals) procedure. Section 60.12(A) describes this as follows:
 
 
 45
 Subject to approval of the President, an exchange of futures in connection with cash commodity transactions or futures for cash commodities may be permitted either before or after the termination of trading in a contract provided, however, that except in the case of an exchange in lieu of a replacement delivery, no exchange shall be made after the last day on which a Delivery Notice is required to be given and no exchange shall be made with respect to a contract if the seller has given a Delivery Notice or if the buyer has received a Delivery Notice from the Clearing House. No such exchange shall be made by a seller who does not, at the time of such exchange, have in his possession the cash commodity to be delivered and no such exchange shall be made which does not require delivery of the cash commodity within a reasonable period of time.[21]
 
 
 46
 Finally, Rule 60.13 deals with the consequences of delinquency and default. A party who is delinquent in performance shall pay to the other party $200 per contract for each day of delinquency not exceeding five days, see Rule 60.13(A)(2)(a), and shall pay the Exchange an amount equal to 10% of the contract value for each contract for each day of delinquency not exceeding five days, see Rule 60.13(A)(2)(b). Rule 60.13(C)(1) defines "contract value" as "the value of the contract computed on the basis of the last settling price for the delivery month." Thus, if the settling price were $6.00 per cwt., the contract value would be $3,000. The latter charge may be reduced by the Board of Governors. A seller or buyer who does not perform his obligation with respect to delinquency within five days is in default, see Rule 60.13(B)(1). He then must pay the other party "as liquidated damages in lieu of all other damages, including consequential damages, 20% of the contract value for each contract in default", Rule 60.13(B)(2).
 
 
 47
 Finally, reference should be made to Sec. 22 of the CEA, enacted by the Futures Trading Act of 1982, Pub.L. No. 97-444, Sec. 235, 96 Stat. 2294, 2322-24 (Jan. 11, 1983), 7 U.S.C. Sec. 25. This section, entitled "Private rights of action", provides for such actions against persons other than contract markets and similar organizations in subsection (a) and against the latter in subsection (b). Broadly speaking subsection (b) imposes liability for actual losses resulting from failure to enforce any by-law, rule, regulation or resolution required to be enforced by Sec. 5a(8) or (9) of the CEA or by the CFTC, or from enforcement of any by-law, rule, regulation or resolution in a manner violating the CEA or any CFTC rule, regulation or order. Section 22(b)(4) provides:
 
 
 48
 A person seeking to enforce liability under this section must establish that the contract market, licensed board of trade, clearing organization, registered futures association, officer, director, governor, committee member, or employee acted in bad faith in failing to take action or in taking such action as was taken, and that such failure or action caused the loss.
 
 Section 22(d) says:
 
 49
 The provisions of this section shall become effective with respect to causes of action accruing on or after the date of enactment of the Futures Trading Act of 1982 [January 11, 1983]: Provided, That the enactment of the Futures Trading Act of 1982 shall not affect any right of any parties which may exist with respect to causes of action accruing prior to such date.
 
 
 50
 (Brackets and emphasis in original).
 
 The Rulings of the District Court
 
 51
 Judge Sofaer ruled that both parts of Wong's complaint--NYME's failure to insist upon amendments to the Maine round white potato futures contract and failure to take action between the delivery failure in November, 1978 and promulgation of the emergency rules on March 8-9, 1979--failed to state a claim on which relief could be granted. While not questioning that the latter claim might be brought as a private right of action under Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), he ruled that the standard of liability was bad faith, which the complaint did not allege, and the claim was thus deficient as a matter of law, 571 F.Supp. at 1541-42. With respect to the NYME's failure to amend the futures contract, Judge Sofaer based his ruling on the non-existence of a private right of action. Id. at 1554-61. Alternatively, he concluded that even if such a private right of action existed, the bad faith standard would apply and this was again not sufficiently alleged. Id. at 1561-62.[22] Judge Sofaer also did not question that Spinale's claim of injury from the adoption of the Emergency Resolutions was of the general sort for which a private right of action would lie under Curran. He ruled that the standard of liability again was bad faith and that Spinale had not made a showing, sufficient to resist summary judgment, that the alleged financial interests of the Governors on the short side of the contract, their alleged personal animus against Spinale, or the alleged irrationality of the emergency action, constituted the bad faith needed to sustain an action for damages against the Exchange, its governors or officers.
 
 
 52
 Wong and Spinale have appealed. The CFTC has filed an amicus brief urging us to disapprove the holding of the District Court that Wong's claim as to NYME's failure to propose amendments to the Maine round white potato futures contract was not of the sort for which there is a private right of action; nine commodity exchanges have filed an amicus brief in opposition to this view.
 
 DISCUSSION
 Wong's Appeal
 
 53
 (1) Private right of action for failure to propose amendments to contract
 
 
 54
 We agree with the district court's well-reasoned conclusion that there is no private right of action for failure by an exchange to propose amendments to the futures contracts traded upon it. In contending that the NYME's failure to revise the Maine round white potato futures contract violated the CEA, Wong relies primarily on Secs. 5(a), 5(g) and 5a(10). He claims as defects in the contract its provision for delivery of exclusively Maine-grown U.S. No. 1 grade potatoes and its requirement of inspections both at point of origin and point of destination. These alleged defects are said to have rendered the contract unsuitable for hedging and thus breached the Exchange's "special duty to ... producers, owners, processors and merchandizers [sic] of potatoes to ensure that the contract which [the NYME] offered for trading was fit for the purpose of hedging." Complaint p 27. The CFTC, taking a somewhat different stance, urges that a privately enforceable duty to amend the terms of a futures contract may be found in Sec. 5(d), which it reads as requiring an exchange to maintain an orderly market.[23] Our review of the CEA and the statutory scheme it creates with respect to contract revisions leads us to conclude that a private damages remedy is unavailable against an exchange for failing to amend the terms of its future contracts.
 
 
 55
 As our exposition of the statutes has shown, Sec. 5, upon which Wong and the CFTC primarily rely for their arguments that a contract market has a duty to maintain continuous observation of and take corrective action concerning its contracts, is found in that section of the CEA, stemming from the Grain Futures Act, ch. 369, Sec. 5, 42 Stat. 998, 1000-01 (1922), which describes the conditions under which the CFTC may grant and continue designation as a contract market. In stark contrast stands Sec. 5a, added by the Act of June 15, 1936, ch. 545, Sec. 7, 49 Stat. 1491, 1497-98, which sets forth the duties of contract markets to the public--duties which notably do not include that of amending the terms of a contract. The CEA thus draws a distinction between the requirements for contract market designation in Sec. 5, which is directed to the CFTC, and the operational duties of designated contract markets in Sec. 5a, which is addressed to each exchange. We see no reason to disregard the framework Congress established by wrenching the provisions in Sec. 5 out of context to create an exchange duty expressly omitted from Sec. 5a.[24] When Congress wished to impose duties on a contract market, it knew how to do so as shown by Sec. 5a. Cf. NLRB v. Bildisco & Bildisco, --- U.S. ----, 104 S.Ct. 1188, 1195, 79 L.Ed.2d 482 (1984).
 
 
 56
 The statutory scheme with respect to revisions of futures contracts traded upon designated contract markets highlights the incongruity of implying a private right of action for failure to make such revisions. In order to receive designation as a contract market, an exchange must submit, pursuant to Sec. 5a(12) and CFTC regulation 1.41(b), 17 C.F.R. Sec. 1.41(b), a proposed futures contract which complies with the requirements for designation as set forth in Sec. 5 and further explained by CFTC Guideline No. 1, 17 C.F.R. Part 5, Appendix A. Once the CFTC approves the contract and designates the exchange as a contract market under Sec. 6, the exchange must enforce all of its by-laws, rules, regulations and resolutions, including contract terms, which have been duly submitted to and approved by the CFTC under Sec. 5a(12), see Sec. 5a(8). If an exchange wishes to amend the terms of an approved futures contract, it must seek the CFTC's subsequent approval pursuant to Sec. 5a(12); in turn, the CFTC according to the statute must afford "interested persons", namely traders, an opportunity to participate in the approval process, see id.; CFTC regulations 13.1-13.6, 17 C.F.R. Secs. 13.1-13.6.
 
 
 57
 There are other indications that the CEA contemplates that revision of contract terms should be a matter for the CFTC and the exchanges, not for the courts in private litigation. CFTC regulation 13.2, 17 C.F.R. Sec. 13.2, at 176, provides that "[a]ny person may file a petition with [the CFTC] for the issuance, amendment or repeal of a rule of general application." When acting within Sec. 5a(10), the Commission must first notify the exchange of its concern and "afford the contract market an opportunity to make appropriate changes." If the exchange, after such notification, fails to act, the statute authorizes the Commission to "change or supplement" the contract rules, but only "after granting the contract market an opportunity to be heard." Id. According to one commentator, "the Commission [as of late 1981] has not formally exercised its authority under Section 5a(10) but, like the gunboat in the harbor, its existence has proven effective in encouraging the markets to rethink certain of their contracts." 1 P. Johnson, supra, Sec. 2.10, at 221. This provision affords no basis for finding the privately enforceable exchange duty Wong wishes to imply, especially since Sec. 5a(10) expressly provides that the CFTC may not revise contracts that "are currently outstanding and open".
 
 
 58
 Similarly, Sec. 8a(7), which was added by the Commodity Futures Trading Commission Act of 1974, Pub.L. No. 93-463, Sec. 213, 88 Stat. 1389, 1404, lodges broad authority in the CFTC with regard to the alteration of contract market rules. This provision authorizes the Commission "to alter or supplement the rules of the contract market", specifically including "terms or conditions in contracts of sale to be executed on or subject to the rules of such contract market", Sec. 8a(7)(A). As with the procedures set forth in Sec. 5a(10), this provision requires the Commission first to request the exchange to make the change "on its own behalf". If the exchange balks, the Commission may act, but only after affording the contract market "appropriate notice and opportunity for hearing". Finally, any change in a contract proposed by the exchange requires approval by the CFTC, Sec. 5a(12), 7 U.S.C. Sec. 7a(12).
 
 
 59
 The foregoing description of the "regulatory scheme designed by congress", Cutner v. Fried, 373 F.Supp. 4, 9 (S.D.N.Y.1974), with respect to revision of futures contracts, admits of no room for a privately enforceable duty on the part of an exchange to amend such contracts. CFTC regulation 1.51(a)(1), 17 C.F.R. Sec. 1.51(a)(1), requires each exchange to monitor market activity "for indications of possible congestion or other market situations conducive to possible price distortion", and a breach of the duty to do this in good faith will give rise to a private cause of action under Curran and now under Sec. 22(b). The form of a contract may augment the need for monitoring, as indeed may have been the case here, but Wong did not allege, and hardly could have alleged, that the Exchange failed in bad faith to monitor. In its own self-interest, a contract market will wish to maintain contracts that are appropriate vehicles for hedging. If an exchange fails to take appropriate action, the CFTC may step in and force its hand pursuant to Sec. 8a(7) or may take more drastic measures such as suspending or revoking the market's designation under Sec. 5b, 7 U.S.C. Sec. 7b. While an exchange's responsibility in this respect may be considered a duty in the colloquial sense, in light of the CEA itself it is not the kind of duty for breach of which Congress can reasonably be assumed to have intended to authorize a private action for damages.[25]
 
 
 60
 Other considerations reinforce this conclusion. Since the number and kinds of changes that may be made in contracts are infinite, damage claims for an exchange's failure to effect such changes, even under a bad faith standard, would likewise be. Almost every disgruntled trader could think of a change in the contract that would have benefitted him although it would likely have hurt others. Private litigation would require courts to decide just when the exchange should have altered the contract, in what manner, and whether the exchange could or would have made the alteration applicable to existing contracts. Serious problems in proving causation and establishing damages would likewise be encountered. For one thing, a rule change would require approval by the CFTC, Sec. 5a(12), 7 U.S.C. Sec. 7a(12). How could a court predict whether this would have been forthcoming, save perhaps if it later had been? How could it predict when the CFTC would have acted? The proposal for an implied private right of action for failure of an exchange to propose contract changes would embark the courts on a sea of difficulties, in a situation where Congress has provided an orderly system of coordinate action by the exchanges and the CFTC.
 
 
 61
 Moreover, in contrast to the cases of traders' violations of the statutory prohibition against fraudulent and deceptive conduct and price manipulation and of an exchange's failure to enforce its own rules, where private causes of action were sustained in Curran, supra, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182, there was no established line of precedent upholding a private suit against exchanges for failure to revise their own contracts similar to the cases cited in footnotes 93 and 94 to Justice Stevens' opinion in Curran, id. at 391-92, 102 S.Ct. at 1845-1846.[26] Finally, we disagree with the CFTC that the provision in the recently enacted Sec. 22(b)(1)(A) affording a private right of action against a contract market that "in enforcing any such bylaw, rule, regulation, or resolution violates this chapter or any Commission rule, regulation, or order" should be read as creating a right of action when the only default by the contract market is in failing to propose an amendment to its contracts. To the contrary we think the failure of Congress, as we read its language, to make any such provision, in an enactment intended to recognize but also to set bounds on private causes of action, argues against holding that one had theretofore been implied, see infra p. 676.
 
 
 62
 (2) Wong's claims for failure to monitor and for delay in taking emergency action
 
 
 63
 In contrast to Wong's claim of a private right of action against the Exchange for failure to amend the Maine round white potato futures contract, the portion of his complaint which alleges failure by the Exchange to monitor came well within the Supreme Court's decision in Curran.
 
 
 64
 Wong charged that the Exchange violated Sec. 5a(8) by failing to enforce CFTC regulation 1.51(a)(2), 17 C.F.R. Sec. 1.51(a)(2), which requires an exchange to monitor the market to detect "situations conducive to possible price distortions." See also CFTC Guideline No. 2, reprinted in 1 Comm.Fut.L.Rep. (CCH) p 6430, at 6211 ("The purpose of market surveillance is to detect adverse situations as they are developing, before the market can be disrupted."). In this regard, the complaint, construed liberally, falls within the line of precedents endorsed in Curran that hold a private right of action may be brought against an exchange for failing to maintain an orderly market by not enforcing provisions of the CEA, CFTC regulations or contract market rules. See, e.g., Deaktor v. L.D. Schreiber & Co., 479 F.2d 529, 534 (7 Cir.), rev'd on other grounds sub nom. Chicago Mercantile Exchange v. Deaktor, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973); Miller v. New York Produce Exchange, 550 F.2d 762, 766-67 (2 Cir.), cert. denied, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977). The question whether a private right of action should be available for failure by the Exchange to take emergency action as soon as it should is closer. Although Miller assumed such a right of action, substantial arguments can be made to the contrary. No rule of the Exchange expressly required it to take such action. Just as we have concluded that Congress deemed Sec. 8a(7), 7 U.S.C. Sec. 12a(7), empowering the CFTC to order the making of new rules, to be a sufficient remedy for an exchange's failure to do this, it could well have considered Sec. 8a(9), 7 U.S.C. Sec. 12a(9), empowering the CFTC to direct a contract market to take emergency action, to be sufficient to deal with the problem of an exchange's dilatoriness in exercising its own powers. Here again the silence of the 1982 statute is evidence that Congress has no wish for a private cause of action for a failure by an exchange to exercise its discretionary power to declare an emergency as soon as a plaintiff thinks it should. We find it unnecessary to decide this question since even if there is a private cause of action for failure to declare or undue delay in declaring an emergency, this portion of Wong's complaint falls, as does the portion relating to monitoring, for want of allegations of bad faith. That bad faith is the standard of liability for suits against an exchange with respect to its taking action authorized by applicable law has been established at least since Daniel v. Board of Trade, 164 F.2d 815 (7 Cir.1947)--a principle now expressly adopted by Congress for actions accruing after January 11, 1983, Secs. 22(b)(4) and (d), 7 U.S.C. Sec. 25(b)(4) and (d). The standard of liability for not taking discretionary action cannot reasonably be lower. The new legislation makes bad faith the standard both as regards taking action and failing to take it, and we can see no reason for thinking there was ever a differentiation between the two.
 
 
 65
 For reasons stated at length by the district court, 571 F.Supp. at 1541, Wong's allegations concerning the NYME's failure to act with respect to what Wong considers to have been a developing crisis concerning the March, April and May contracts do not measure up to the requirements of the bad faith standard. Although the complaint claims the existence of a conspiracy of unnamed corporations and individuals to increase prices in the potato futures market through manipulation, it does not allege that the defendants knew this, let alone that their failure to act was based on ulterior motives. Nothing in the record suggests that the complaint could have been amended to overcome these deficiencies. To the contrary, the CFTC report shows that the NYME promptly investigated the failure of the November deliveries and concluded, after further monitoring of the situation, that the probability was that the problem would work itself out. Although, armed with the benefit of hindsight, one might criticize the Exchange for not launching a more searching investigation, its conduct was far removed from bad faith. A similar analysis applies to Wong's claim with respect to NYME's delay in taking emergency action. The dimensions of the emergency became apparent only during the week of March 5, and the Exchange acted during the night of March 8-9. Wong does not--and on this record could not--allege that this delay was in bad faith.
 
 Spinale's Appeal
 
 66
 There is no dispute that Spinale's case is within the private right of action recognized by the Supreme Court in Curran. There can likewise be no dispute that the standard of liability is "bad faith". The close question is whether the district court erred in foreclosing further discovery in contravention of Fed.R.Civ.P. 56(f).[27]
 
 
 67
 As analyzed by the district judge, 571 F.Supp. at 1544-45, Spinale's complaint outlined two "relatively specific theories" of bad faith. The first theory was alleged in the Sixth and Seventh Claims for Relief. Taking these in inverse order, the Seventh Claim asserted that virtually all members of the Board were affiliated with Exchange clearing members firms that would have been required to cover margin requirements of the shorts if the latter were unable to do this as prices rose and also to guarantee the profits of the longs in the event of a default by the shorts; hence all Board members holding shares in or in any way employed by clearing firms were sufficiently interested in the emergency action of March 8-9, 1979, that their failure to disqualify themselves constituted bad faith. The Sixth Claim asserted that various Board members
 
 
 68
 "controlled, advised, and/or had a financial interest in short positions respecting Potato Futures Contracts held in the names of their friends, relatives, employees, nominees, partners, stockholders, business associates, agents or customers."
 
 
 69
 As described by the district judge,
 
 
 70
 Spinale claims that, given these short positions, Board members and their various cohorts "would have suffered substantial economic losses" had the Board not taken emergency action which forstalled [sic] both delivery defaults by March contract "shorts" and a drastic appreciation in the price of the April and May contracts. Thus, Spinale alleges, the emergency actions were taken in a bad-faith effort to preserve the assets of Board members and their "short" friends, relatives, and associates.
 
 
 71
 571 F.Supp. at 1545 (quoting portions of complaint).
 
 
 72
 The district judge characterized Spinale's second theory as having been raised "outside his complaint", id. at 1548, but nevertheless considered it. This theory contains a number of allegations, only two of which we deem worthy of discussion additional to Judge Sofaer's. These were a claim that the emergency action was motivated by personal animosity of certain Board members to Spinale, id. at 1551-52, and a claim that the Board's "emergency action was so negligent and irresponsible as to support independently a finding of bad faith," id. at 1552.
 
 
 73
 Judge Sofaer quickly dispatched the Seventh Claim for Relief. He found that the fund referred to in the complaint "has never been used and, given the solvency of most of the clearing members with 'short' positions in the potato contract, its use in the event of trader defaults on the 1979 contracts was highly unlikely." Id. at 1545. He further concluded that
 
 
 74
 [i]f such a degree of self-interest were allowed to demonstrate bad faith, then exchange-board members involved in futures markets would inevitably be subject to bad-faith charges, and the concept of exchange self-regulation would be undermined.
 
 
 75
 Id. We agree. The concept of exchange self-regulation necessarily implies that the boards of exchanges shall contain a substantial number of persons with first-hand knowledge of the market and that these persons shall be free to share in important deliberations. A principle requiring them to disqualify themselves simply because of the obligations of clearing house membership would run counter to this concept.
 
 
 76
 The Sixth Claim for Relief received more extensive analysis. Apparently taking it as a given that a showing that members of the Board had predominant and extensive short interests would at least create a triable issue of fact, Judge Sofaer concluded that nevertheless there was none. In reaching this conclusion he drew on the factual findings in the CFTC report[28] and on fifteen affidavits concerning the interests of each Board member. He summarized the latter as follows, id. at 1546 (footnotes omitted):
 
 
 77
 These documents indicate that no Board members present at the March 8, 1979 meeting held a personal position in the March, April, or May 1979 contracts at the time of the meeting or at any subsequent time; that the majority of the firms with which these members were associated held no position in the March, April, or May contract on March 8, 1979, or at any subsequent time; that four of these members' firms held positions in the March, April, or May contracts on March 8, 1979, but three of the four were long; that customers of seven of these members' firms held positions in the March, April, or May contract[s] on March 8, 1979, but none of these customer positions was under the control of a Board member, and five of the seven firms held net-long customer positions; that only one of the four Board members not at the March 8 meeting held a personal position on or subsequent to March 8, 1979, but it was net long; that the firms or firm customers of only two of these four absent members held positions, but these positions were both net long; and, finally, that all the fourteen (of fifteen) governors named by Spinale as defendants deny ever having any knowledge of any "close friends or relatives" holding positions in the March, April, or May contracts. Thus, the only apparent evidence of financial self-interest among Board members present at the March 8, 1979 meeting consists of (1) the house positions for four members' firms and (2) the customer positions of seven members' firms. See Defendants' Memorandum (July 23, 1982), Ex. 1 (detailed summary of house and customer positions relating to each Board member).
 
 
 78
 The judge found that the evidence of the house positions was insufficient to raise an issue of bad faith since all but one of the four were short and the customer positions of the four were predominantly long. Id. at 1546-47. With respect to the customer positions, after referring to Judge Clark's opinion for this court in Crowley v. Commodity Exchange, Inc., 141 F.2d 182, 188 (1944), he made an intensive study and concluded:
 
 
 79
 These instances of potential conflict, in the context of legislatively sanctioned self-regulation, do not raise an issue of fact concerning bad faith. In each individual instance of potential conflict, the likelihood of ulterior motive is substantially negated by lack of control, abstention, or offsetting interests. Moreover, even if each instance of potential conflict in fact represented an instance of bad faith, the three instances combined could not be deemed to taint the entire Board's actions, especially in light of the offsetting instances of potential conflict with short interests in the Board as a whole.
 
 
 80
 571 F.Supp. at 1547-48.
 
 
 81
 Spinale does not seriously challenge the correctness of the judge's factual findings on the material the judge had before him; his point is rather that he was entitled to depose the Governors in the hope of developing that a significant number of them were in fact motivated by financial self-interest in protecting the shorts. The judge's answer to this was that
 
 
 82
 [t]he bad-faith standard can be satisfied only by substantial evidence supporting more than mere suspicion or speculation about a Board's ulterior motives for taking emergency action. Inasmuch as a system of self-regulation inevitably will provide dissatisfied traders with some evidence consistent with self-interest, the existence of bad faith must be tested by an objective standard, rather than a subjective standard that would permit trial on the issue of board members' state of mind virtually without regard for the insubstantiality of the objective, circumstantial evidence of ulterior motive.
 
 
 83
 Id. at 1548.
 
 
 84
 With respect to Spinale's animosity claim, the record confirms that, as said by Judge Sofaer, id. at 1551, "Spinale was undoubtedly on the minds of some Board members on the night of March 8, 1979." The owner of a large fresh fruit and vegetable packaging firm, with over thirty years of experience in the business, and a shrewd trader, he had established substantial long positions in the fall of 1978 after surmising that the quality of that year's March potato crop was not up to par. By March 8 he held, on the long side, apparently all sixty-six of the outstanding open March contracts, approximately 100 of the 207 outstanding open April contracts, and perhaps as many as 150 of the 10,000 outstanding May contracts. He had utilized the EFP procedure advantageously, see supra note 21, to realize a substantial profit by negotiating a basis price with the shorts that, nor surprisingly, considerably exceeded the prevailing cash market price. Naturally this did not endear Spinale to the shorts or to NYME officials, who considered him to be "overreaching" and taking "unfair" advantage of the crisis even though his actions were entirely legal.
 
 
 85
 A supplemental affidavit of Spinale's details some manifestations of this hostility. He recalled that one of the Governors, Sam Fishberg, pulled him aside on the floor of the Exchange during the week of March 5-8, 1979, and said that Spinale's long position in the market and his expressed desire to stay with his position and accept deliveries of the potatoes threatened to ruin everything that NYME had done over the years to build up trading volume. Spinale also cited adverse comments on him by members and staff of the CFTC at meetings before and after the Board's March 8-9 meeting which, he urges, could reasonably be deemed to have reflected remarks by the staff of the NYME, particularly President Levine and Chairman Marks, the chief architects of the emergency action. Spinale's floor broker, Leon Grappel, submitted an affidavit stating that during the week of March 5-8, 1979, members of the Board complained to him on the floor about Spinale's behavior in insisting upon deliveries of the March contract or exchanges for physicals at prices ranging up to $9.00 per cwt. Grappel added that it was his impression that these members, whom he was prepared to identify under a protective order, "did not like Mr. Spinale. Therefore their judgment whether or not a crisis existed may have been influenced by personal prejudice toward him."
 
 
 86
 The judge's answer to this was that any animosity of Board members toward Spinale "was not improperly motivated by concerns foreign to the Board's self-regulating duties", that the Board "may well have been justified in focusing concern on Spinale, since the Board arguably should prevent members from acts of excessive greed in a time of artificially created crisis", and that therefore "the personal animosity alleged by Spinale does not create an issue of fact concerning Exchange bad faith." 571 F.Supp. at 1552. Spinale replies that he was not alleged to have been doing anything prohibited by statute, regulation or rule but was simply realizing on his acumen in taking seriously reports as to the poor quality of the 1979 potato crop and the November 1978 delivery failures whereas the shorts had not; that his conduct thus created no justifiable basis for animosity; and that in any event he was entitled, under Fed.R.Civ.P. 56(f), to further discovery to explore what actually occurred.
 
 
 87
 Spinale also asserts that he is entitled to further discovery with respect to his claim that the Board's emergency action was so irresponsible as to support a finding of bad faith. He contends that the Board's declaring "an unprecedented sweeping emergency on the basis of incomplete and conflicting data respecting the actual condition of the Maine potatoes", including its decision to treat the March contract on the same footing as those of April and May, even though trading had ceased in the former,[29] created a triable issue of whether the Exchange's actions were so inappropriate as to support a finding of bad faith. Judge Sofaer concluded that "[o]nly a demonstration of reckless and virtually irrational exchange behavior could conceivably be permitted to raise independently an issue of fact concerning bad faith," 571 F.Supp. at 1552, and found, largely on the basis of the CFTC report, that Spinale had failed to make such a showing.
 
 
 88
 This case requires a more refined analysis of what constitutes "bad faith" by a contract market or its governors and of how far such bad faith creates liability for otherwise legitimate action than has generally been made. Specifically, can defendants in such a case be found liable if their action was prompted in part by self-interest or animosity but still was within the range of discretion accorded them by the regime of exchange self-regulation?
 
 
 89
 We begin our analysis with Daniel, supra, 164 F.2d 815, which has long been the leading case in this area. The case came before the court on a motion to dismiss the complaint, and the allegations thus had to be taken as true. The allegations were strong. The complaint averred that enactment of the challenged regulations was in violation of the duty and of the prior course of conduct of the defendants, the directors, governors and officers of the Chicago Board of Trade and the Board's clearing house; that by them the defendants " 'willfully, maliciously, and for their own personal gain through profits accruing to them through their individual brokerage houses continued said Board of Trade in operation when the open and free and orderly market had ceased to exist' ", and that the regulations " 'were adopted for the purpose of continuing the operation on the Board of Trade for the personal advantage and gain of the defendants as hereinbefore alleged' " and for the added purpose of attempting to protect themselves against liability in an antitrust suit. Id. at 818. The court said that if the regulations were in accordance with the exchange's rules and by-laws, defendants had violated no rights of the plaintiffs "in the absence of an averment of bad faith amounting to fraud." Id. at 819. It then went on to say that "[b]ecause of the Board's relation to the public, it must ... act with the utmost objectivity, impartiality, honesty, and good faith". Id. at 819-20. The Board owed that duty because of the confidence reposed in it by its members, "and the further fact that the directors, governors and officers ... may themselves be members of the market, and as such have to act where their own private interests are concerned." Id. at 820.
 
 
 90
 The opinion seems to speak with two different voices. On the one hand, in a phrase beloved by defendants, a complaint must be dismissed "in the absence of an averment of bad faith amounting to fraud"--more colloquially that in order for defendants to be found liable, they must have acted very badly indeed. On the other hand, in a phrase equally beloved by plaintiffs, the governors must "act with the utmost objectivity, impartiality, honesty, and good faith"--more colloquially that in order for defendants to escape liability, they must have acted very nobly, almost as nobly as limned in Chief Judge Cardozo's famous description of the duties of a trustee in Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928), despite--or even because of--the fact that they must often act "where their own private interests are concerned."
 
 
 91
 The opinion makes three more statements which do little to clear up how far the plaintiff must show the action was motivated by ulterior rather than legitimate interests. One is that if the individual defendants "did not act in good faith, but acted to further their own selfish interests and for their personal gain, the corporate defendants' action cannot be bona fide." Another is that "in the absence of such infidelity to their trust by said directors, governors, and officers of the Board and Clearing as to amount to fraud, the acts and conduct of the defendants as set forth in the amended complaint are insufficient to entitle the plaintiffs to any relief." Finally, and this is the only holding, "the plaintiffs' allegations are sufficient to charge fraudulent conduct." 164 F.2d at 820.
 
 
 92
 Later decisions have shed little light on the question whether the self-interest or ulterior motive of the governors of an exchange must be the sole or at least a dominant factor in the exchange's action or whether it suffices that such factor may have played a not insignificant part. Usually there has been no occasion to do this, since rulings have come upon motions to dismiss complaints which either alleged that an action was taken solely to advance board members' interests, e.g., Seligson v. New York Produce Exchange, 378 F.Supp. 1076, 1083 (S.D.N.Y.1974), to conceal and protect illegal traders, e.g., Smith v. Groover, 468 F.Supp. 105, 107, 118 (N.D.Ill.1979), to further a board members' conspiracy to manipulate the market, e.g., Strobl v. New York Mercantile Exchange, 561 F.Supp. 379, 382-83, 384 (S.D.N.Y.1983), or to line board members' pockets, e.g., Gordon v. Hunt, 558 F.Supp. 122, 123 (S.D.N.Y.1983), or, on the other hand, failed to make any adequate allegation of "ulterior motive", as in P.J. Taggares Co. v. New York Mercantile Exchange, 476 F.Supp. 72, 77 (S.D.N.Y.1979) (Weinfeld, J.). The only case we have found which addresses the problem here under discussion is Bishop v. Commodity Exchange, Inc., 564 F.Supp. 1557, 1562 (S.D.N.Y.1983). In a thoughtful opinion, Judge Lasker held that "if an exchange enacted a rule for the sole purpose of advancing the private interests of its members, and if the rule damaged the plaintiffs, it would not be a defense for the exchange to allege that the rule was reasonable", id. at 1562 (emphasis in original), but, on the other hand, "[s]hould a Governor vote in favor of such a rule in the belief that the rule served the public interest, even if also in the expectation and hope that it would serve his personal interest, his behavior would not give rise to liability ...," id. After plaintiff filed an amended complaint, Judge Lasker clarified his earlier ruling:
 
 
 93
 The deficiency of the original complaint was that it alleged only that the Governors had enacted the [challenged] rule in order to advance their own interests, an allegation which left open the possibility that the furtherance of their own interests was merely incidental to their attempt to advance the public interest. The amended complaint, on the other hand, clearly alleges that the Governors' advancement of their own interests was the dominant, not merely the incidental, motivation for their actions. Such an allegation adequately states a cause of action.
 
 
 94
 Bishop v. Commodity Exchange, Inc., 581 F.Supp. 1278 at 1279 (S.D.N.Y.1984).
 
 
 95
 We have also sought illumination in the legislative history of the 1982 provision, Sec. 22(b)(4), 7 U.S.C. Sec. 25(b)(4), in regard to bad faith,[30] without having gained much thereby.
 
 
 96
 As originally introduced, neither the House bill, H.R. 5447, 97th Cong., 2d Sess. (Feb. 3, 1982), nor the companion bill in the Senate, S. 2109, 97th Cong., 2d Sess. (Feb. 11, 1982), provided for a private right of action. The private right of action based on bad faith first appeared in the amended version of the House bill, as reported by the Agriculture Committee on May 17 (doubtless hastened by the Court's Curran decision announced two weeks earlier), and referred to the Energy and Commerce Committee for further hearings, see H.R. 5447, 97th Cong., 2d Sess. Sec. 236 (May 17, 1982).
 
 
 97
 Once the House passed H.R. 5447, supra, as amended, on September 23, 1982, see 128 Cong.Rec. H7523 (daily ed. Sept. 23, 1982), the Senate chose one week later formally to consider the House bill in lieu of S. 2109, supra. The Senate passed the House bill in an "amended form", which eliminated the provision containing the private right of action and was, in essence, the original Senate bill. See 128 Cong.Rec. S13104 (daily ed. Oct. 1, 1982). The Senate ultimately adopted legislation which provided for the private right of action after the House and Senate conferees hammered out the final version of H.R. 5447, see infra.
 
 
 98
 At the House hearings a New York attorney objected to the bad faith limitation; he thought that the burden of showing good faith should be placed on the exchanges or that the standard of liability should be left for judicial elaboration. SEC/CFTC Jurisdictional Issues and Oversight--Part 2: Joint Hearings on H.R. 5447, H.R. 5515 and H.R. 6516 Before the Subcomm. on Telecommunications, Consumer Protection, and Finance and the Subcomm. on Oversight and Investigations of the House Comm. on Energy and Commerce, 97th Cong., 2d Sess. 587, 588, 601 (1982). At the Senate hearings, Chairman Philip Johnson of the CFTC, responding to a question by Senator Lugar concerning the proposed private right of action, stated:
 
 
 99
 As far as private right of action is concerned, the Commission's position is that we favor a private right of action against those industry professionals who are found to have violated the substantive provisions of the act, such as having committed fraud, engaged in manipulation, conducted prearranged trading or matters of that nature ....
 
 
 100
 We draw a distinction in the case of self-regulatory organizations. Our view is against private rights of action as a rule in this instance, except where the exchange itself is engaged in the type of business conduct that I described, or where the exchange's action is motivated by conflict of interest--self-dealing, rather than a conscientious attempt to do what is best for the market as a whole.
 
 
 101
 CFTC Reauthorization: Hearings on S. 2109 Before the Subcomm. on Agricultural Research and General Legislation of the Senate Comm. on Agriculture, Nutrition and Forestry, 97th Cong., 2d Sess. 35 (1982). The amended House version, substantially what was advocated by Chairman Johnson, prevailed in the conference committee, see H.R.Conf.Rep. No. 964, 97th Cong., 2d Sess. 53, reprinted in 1982 U.S.Code Cong. & Ad.News 3871, 4055, 4071, with Senator Helms reporting to his colleagues:
 
 
 102
 The conferees decided to adopt the House provisions because this area of the law is new and unchartered, and it was felt that the provision would clarify the limits of liability for violations of the [Commodity Exchange Act],
 
 
 103
 128 Cong.Rec. S14814 (daily ed. Dec. 15, 1982).
 
 
 104
 We believe that Judge Lasker's opinion in Bishop, supra, 564 F.Supp. at 1562, takes substantially the right approach toward passing on the sufficiency of complaints. It takes into account the competing needs of exchanges and their officials and of the trading public. Although governors must be able to police the markets effectively with the broad discretion accorded by Congress, traders must not be deprived of their right to challenge illegitimate regulatory action. The Commodity Exchange Act, which embodies the statutory model of exchange self-regulation, mandates that we strike a balance that does not insulate exchange officials from answering serious questions posed by injured traders. To do otherwise would drastically curtail the private right of action deemed essential to the regulatory framework established by Congress. Therefore, when self-interest or other ulterior motive unrelated to proper regulatory concerns is alleged to constitute the sole or the dominant reason for the exchange action, a complaint is sufficient even though the action was not beyond the bounds of reason. On the other hand, if the governors sincerely and rationally believe their action is in the public interest, there should not be liability simply because the action has the incidental effect of advancing their private interests or damaging someone whom they do not like.
 
 
 105
 Once there has been a sufficient complaint and the court must deal with the merits, it may find help in the recent decision of the Supreme Court with respect to discriminatory discharges of pro-union employees in NLRB v. Transportation Management Corp., --- U.S. ----, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), which in turn derived from the Court's decision in Mount Healthy City Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (discharge motivated by disapproval of employee's exercise of First Amendment rights). Under that test a plaintiff like Spinale would have the initial burden of showing that ulterior motive, e.g., financial gain or personal animosity was "a substantial or motivating factor", 103 S.Ct. at 2473, in the taking of or failure to take action. If he fails to do that, the case is at an end. If he succeeds, the exchange could escape liability if it proved by a preponderance of the evidence that the action or inaction would have occurred anyway because that course was reasonably believed to be in the public interest.
 
 
 106
 If we were reviewing a judgment against Spinale after a bench trial which had produced only the record now before us, we would readily affirm. The issue on Spinale's appeal, however, is the different one whether it was proper to grant summary judgment without allowing him to conduct some discovery on the issue of bad faith, including the sub-issue, just discussed, of the effect of bad faith on the emergency action. His counsel appropriately relies on our statement in Friedman v. Meyers, 482 F.2d 435, 439 (2 Cir.1973), citing Cali v. Eastern Airlines, Inc., 442 F.2d 65, 71 (2 Cir.1971), that summary judgment is "particularly inappropriate" where it is sought on the basis of "the inferences which the parties seek to have drawn [as to] questions of motive, intent, and subjective feelings and reactions." With great respect we simply cannot agree with the district court's conclusion that Spinale's papers "fail to raise a genuine issue of fact concerning the bad faith Spinale must show to recover from Exchange defendants." 571 F.Supp. at 1544. In particular, we do not agree with the judge's conclusion that Spinale's accusations of animosity can be rubbed off simply because the alleged animosity related not to personal factors but to Spinale's business conduct. However distasteful this was to defendants, it seems to have been merely capitalizing on Spinale's successful assessment of the risks. The Exchange is not a social club. We see no reason to believe that if a surplus of potatoes had developed, the shorts would have exhibited a higher quality of mercy to Spinale than he did to them. Our elaboration of the causality of "bad faith" enhances the importance of determining how far, if at all, the Governors were motivated into taking the emergency action by impermissible factors. Having shown some financial interest and some personal animosity, Spinale should not be precluded from probing this further because of the surface plausibility of defendants' affidavits, the bare minutes of the Governors' meeting, or the CFTC report; he is entitled to limited discovery as to just what interests the defendants had and as to what actually occurred at the Governor's meeting, however unlikely it is that this probing will be fruitful.[31] He is entitled also to some limited discovery as to the rationality of the emergency action[32]--particularly insofar as this included the March contract as to which trading had ceased.[33] We leave the precise scope and manner of the discovery to the good judgment of the able and experienced district judge.
 
 
 107
 In No. 83-7885 the judgment dismissing the complaint is affirmed, with costs to appellee. In No. 83-7891 the grant of summary judgment is reversed and the cause is remanded for further proceedings under Fed.R.Civ.P. 56(f) consistent with this opinion, with costs to abide the event.
 
 
 
 [1]
 Trading in the March contracts had ceased on February 28, 1979. As of the close of business on March 8, 66 contracts were still open, the long interest in all apparently being held by Spinale
 
 
 [2]
 Wong's complaint was filed on March 3, 1981. S.D.N.Y.Civ.R. 4(c) directs the party asserting the claim for a class to move for certification under Fed.R.Civ.P. 23(c)(1) within 60 days after filing of the complaint. However, the district court approved stipulations filed on May 19, 1981 and again on June 17, 1982 that suspended indefinitely the time period for Wong's filing a motion for class certification. Evidently no further actions were taken with respect to the issue of class certification, either by the parties or the district court
 
 
 [3]
 This had given rise to the litigation in Leist v. Simplot, 638 F.2d 283 (2 Cir.1980), aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), and other cases. The default in the potato futures market, which spawned that round of litigation, "was virtually unprecedented and, in the words of CFTC officials and members of the industry, shocked the commodity markets and the participants more than any other single event in recent years." H.R.Rep. No. 1181, 95th Cong., 2d Sess. 99 (1978)
 
 
 [4]
 Apart from his position in the open March contracts, see supra note 1, Spinale alleged in his amended complaint that he held "approximately 100 April contracts and no more than 150 May contracts" on March 8, 1979. Under CFTC regulation 150.10(a)(1), 17 C.F.R. Sec. 150.10(a)(1), and NYME Rule 60.17(1)(b), Spinale's net long position in any one month was limited to 150 contracts
 
 
 [5]
 In this statement, we have drawn not only on the affidavits submitted by the parties but also on the report to the Commodity Futures Trading Commission (CFTC) by its Division of Trading and Markets dated February 1, 1980 (the CFTC report) concerning the NYME's emergency action. The admissibility of this report will be discussed infra note 28
 
 
 [6]
 Eleven of these were liquidated under the EFP procedure; the record is silent with respect to the other four
 
 
 [7]
 On the other hand, Marshall Horn, Chief of the Market Surveillance Section in the CFTC's New York Regional Office, was of the view that the November 1978 deliveries showed there was a problem with the quality of the Maine potato crop. He noted that in November word was beginning to spread among the potato trade that the crop was susceptible to damage because of the dry season
 
 
 [8]
 As indicated supra note 1, 66 March contracts remained open. The April contract had 207 open positions and the May contract had 10,000 such positions
 
 
 [9]
 For an example of such joint emergency action between the Commission and a commodities future trading market, see Compania de Salvadorena de Cafe, S.A. v. Commodities Futures Trading Comm'n, 446 F.Supp. 687 (S.D.N.Y.1978)
 
 
 [10]
 The CFTC report acknowledges that the Board had the following information:
 The USDA Fruit and Vegetable Quality Division in Washington, having conducted its own inquiry, had concluded that the problem was not one of inspectors applying inspection standards inconsistently. The defects were conditional rather than grade; the "unique quality of the 1979 crop" caused the potatoes to deteriorate during transit after the point of origin inspection.
 
 
 [11]
 Problems concerning the deliverable supply of potatoes pursuant to the Exchange's round white potato futures contract have arisen since delivery began on the March 1979 Contract. At the end of the trading in the March Contract the open interest was 172 contracts. As of the close of business on March 8, 1979, 66 contracts remained open. 103 contracts had been EFP'd. Potatoes had been delivered in New York for 32 contracts and 3 contracts passed inspection and 29 contracts failed
 This 90% rate of failure is extremely unusual. Since the potato contract was revised in 1976, the average rate of failure for potatoes inspected in New York for delivery on contracts has approximated 15%. The highest rate of failure for any one delivery month was 20%. Indications are that a substantial percentage of the potatoes inspected for delivery in New York, which failed to meet the standards of the March Contract, would have failed inspection as commercials if they had been delivered as commercials which are deliverable on the April and May Contracts at a discount.
 The potatoes which failed to meet Exchange specifications suffered from pressure bruises and discoloration. Such defects resulted from conditions during the growing and harvesting season in Maine and the subsequent storage in Maine and transportation of the potatoes to New York.
 The longer the potatoes are kept in storage, the more they break down. Such deterioration plus warmer weather in the Spring is very likely to cause more delivery problems in April and May.
 United States Department of Agriculture officials have confirmed the Exchange's perception that the potatoes were breaking down in transit from Maine to New York. They also have reported that this year's crop has been particularly vulnerable to this problem.
 
 
 [12]
 Each member of the Board stated that he had no personal position in the March, April or May 1979 Contracts but some of the members of the Board indicated that their firms carried house and/or customer positions in the March, April or May 1979 contracts. The Chairman informed the meeting that the firm in which he was a stockholder and President had a position which was not under his control. It was the sense of the meeting that each member of the Board determine for himself whether he could vote objectively and impartially on any of the resolutions which might be presented at the meeting
 
 
 [13]
 The CFTC report contains a more complete account of the Board's discussions. The report shows that the Board considered each of the alternatives presented by the NYME staff, see supra. Moreover, Chairman Marks, in his statement presented at a CFTC public hearing in Presque Isle, Maine, on May 9, 1979, explained the Board's concern:
 The Exchange's concern was not limited to deliveries under the March contract. At this time almost 10,000 April and May contracts were open, the futures price of these contracts had begun to rise sharply as the delivery problems in the March contract unfolded, although the cash market prices remained constant. The cash price and the futures price for the April and May contracts were diverging at a time when the differential should have been narrowed. It was clear that the delivery experience in March was affecting trading in the April and May contracts, and there was a serious question as to whether the futures contract would continue to reflect the real economic value of potatoes. This must happen for the maintenance of a viable contract.
 
 
 [14]
 Mr. Meierfeld had left the room before passage of these resolutions
 
 
 [15]
 As mentioned supra note 5, the CFTC subjected the Board's action to a full-scale administrative review pursuant to CFTC regulation 1.41(f), 17 C.F.R. Sec. 1.41(f). The CFTC's Division of Trading and Markets concluded that the Board's action was not arbitrary, capricious or in bad faith and thus recommended that the Commission take no further action. The CFTC has taken none
 
 
 [16]
 For a review of the history of the CEA, see the discussion in Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 360-67, 102 S.Ct. 1825, 1830-1833, 72 L.Ed.2d 182 (1982)
 
 
 [17]
 The purpose of this subsection
 is to assure that deliveries on the futures contracts are at the location of a viable cash market where the commodity can ordinarily be bought by shorts to effect delivery and where longs can usually resell the commodity after delivery is taken.
 
 
 [1]
 P. Johnson, Commodities Regulation Sec. 2.09, at 219 (1982). To promote compliance with Sec. 5(a), Congress in 1974 empowered the CFTC to order changes in delivery points and to direct changes in price differentials based upon the commodity's quality or its location. See Sec. 5a(10), 7 U.S.C. Sec. 7a(10)
 
 
 [18]
 Relevant legislative history shows that this "public interest" requirement embodies an "economic purpose test" whereby a board of trade must demonstrate that its proposed contract will be used for base-pricing and hedging, not just for speculation. See H.R.Conf.Rep. No. 1383, 93d Cong., 2d Sess. 36, reprinted in 1974 U.S.Code Cong. & Ad.News 5843, 5894, 5897-98
 Also relevant are several regulations and guidelines enacted by the CFTC concerning the requirements for contract market designation. CFTC regulation 1.51, 17 C.F.R. Sec. 1.51, entitled "Contract market program for enforcement", [direction of] provides, in pertinent part:
 (a) Each contract market shall use due diligence in maintaining a continuing affirmative action program to secure compliance with the provisions of Sections 5, 5a, 5b, 6(a), 6b, 8a(7), 8a(9) and 8c of the Act, with the regulations implementing Section 4c(c) of the Act, and with all the contract market's bylaws, rules, regulations and resolutions which such contract market is required by the Act or these regulations to enforce.
 Such a program must include, inter alia, "[s]urveillance of market activity for indications of possible congestion or other market situations conducive to possible price distortions ...." Id. 1.51(a)(1), 17 C.F.R. Sec. 1.51(a)(1). The CFTC has issued Guideline No. 2, reprinted in 1 Comm.Fut.L.Rep. (CCH) p 6430, at 6210-13, which elaborates the market surveillance requirements of regulation 1.51.
 Regulation 1.50, 17 C.F.R. Sec. 1.50, entitled "Demonstration of continued compliance with the requirements for contract market designation", provides:
 (a) With respect to each commodity or commodity option for which it has been designated as a contract market, each contract market shall file with the Commission within 60 days of a Commission request, or within such longer period as the Commission may specify in the request, a written report containing such supporting data, and other information and documents as the Commission may specify, that demonstrates that such contract market is complying with the conditions and requirements of Sections 5 and 5a of the Act and these regulations. At the discretion of the Commission, the information requested may be limited to certain conditions and requirements of Sections 5 and 5a of the Act and these regulations.
 (b) Any failure by a contract market to continue to comply with the conditions and requirements for designation as a contract market as set forth in Sections 5 and 5a of the Act or these regulations, and any failure or refusal to file the information required by this section shall be cause for action by the Commission under the Act or these regulations.
 (c) Upon showing a good cause by a contract market, the Commission may extend for a reasonable time the filing date for any report under this section.
 CFTC Guideline No. 1, 17 C.F.R. Part 5, Appendix A, at 105-07, details the showing required by the Commission for contract market designation.
 
 
 [19]
 (4) When so directed by order of the Commission, provide for a period, after trading in contracts of sale of any commodity for future delivery in a delivery month has ceased, during which contracts of sale of such commodity for future delivery in such month may be satisfied by the delivery of the actual cash commodity. Whenever, after due notice and opportunity for hearing, the Commission finds that provision for such a period of delivery for any one or more commodities or markets would prevent or tend to prevent "squeezes" and market congestion endangering price stability, it shall, by order, require such period of delivery (which shall be not less than three nor more than ten business days) applicable to such commodities and markets as it finds will prevent or tend to prevent such "squeezes" and market congestion: Provided, however, That such order shall not apply to the then existing contracts;
 ....
 (8) Enforce all bylaws, rules, regulations and resolutions, made or issued by it or by the governing board thereof or any committee, which relate to terms and conditions in contracts of sale to be executed on or subject to the rules of such contract market or relate to other trading requirements, and which have been approved by the Commission pursuant to paragraph (12) of this section; and revoke and not enforce any such bylaw, rule, regulation, or resolution, made, issued, or proposed by it or by the governing board thereof or any committee, which has been disapproved by the Commission;
 ....
 (10) Permit the delivery of any commodity, on contracts of sale thereof for future delivery, or such grade or grades, at such point or points and at such quality and locational price differentials as will tend to prevent or diminish price manipulation, market congestion, or the abnormal movement of such commodity in interstate commerce. If the Commission after investigation finds that the rules and regulations adopted by a contract market permitting the delivery of any commodity on contracts of sale thereof for future delivery, do not accomplish the objectives of this paragraph, then the Commission shall notify the contract market of its findings and afford the contract market an opportunity to make appropriate changes in such rules and regulations. If the contract market within seventy-five days of such notification fails to make the changes which in the opinion of the Commission are necessary to accomplish the objectives of this paragraph, then the Commission after granting the contract market an opportunity to be heard, may change or supplement such rules and regulations of the contract market to achieve the above objectives: Provided, That any order issued under this paragraph shall not apply to contracts of sale for future delivery in any months in which contracts are currently outstanding and open: And provided further, That no requirement for an additional delivery point of points shall be promulgated following hearings until the contract market affected has had notice and opportunity to file exceptions to the proposed order determining the location and number of such delivery point or points ....
 We note that Sec. 5a(8) has been amended recently, in a manner not pertinent to our discussion, by the Futures Trading Act of 1982, Pub.L.No. 97-444, Sec. 216(1), 96 Stat. 2294, 2306 (1983).
 
 
 [20]
 Congress' recent amendment to Sec. 5a(12) in the Futures Trading Act of 1982, Pub.L. No. 97-444, Sec. 216(2), 96 Stat. 2294, 2306-07 (1983), does not materially affect the substance of the provision quoted above pertaining to our discussion
 We also direct attention to Sec. 8a(7), 7 U.S.C. Sec. 12a(7), which empowers the CFTC to alter or supplement the rules of a contract market, including the terms of the futures contract traded, "after appropriate notice and opportunity for hearing." Section 8a(9), 7 U.S.C. Sec. 12a(9), augments this authority by empowering the CFTC to force rule revisions on a contract market in an emergency situation. Although this latter provision apparently dispenses with the requirement that the CFTC must afford a contract market notice and an opportunity for a hearing before imposing amendments or new rules on that market, the legislative history of Sec. 8a(9) contains the statement that, with respect to the CFTC's power to order amendments to the terms of futures contracts, "nothing in the [CFTC] emergency powers section, ... or any other provision of the bill is to be used by the Commission to violate unnecessarily the sanctity of contract." S.Rep. No. 1131, 93d Cong., 2d Sess. 25, reprinted in 1974 U.S.Code Cong. & Ad.News 5843, 5865.
 The recent amendment to Sec. 8a(9) in the Futures Trading Act of 1982, Pub.L. No. 97-444, Sec. 225, 96 Stat. 2294, 2315-16 (1983), subjects any action taken by the CFTC under this subsection to exclusive judicial review in the United States Courts of Appeals.
 
 
 [21]
 The CEA, Sec. 4c(a), 7 U.S.C. Sec. 6c(a), and CFTC regulation 1.38(b), 17 C.F.R. Sec. 1.38(b), authorize the EFP procedure. A leading commentator describes this procedure as follows:
 [A] commodity merchant will contract in the cash market to buy or sell the commodity, not at a fixed price, but on a "basis," which means at a certain price above or below the futures market price at the date when the sale is concluded. Commonly, but not necessarily, both parties will hold futures contracts as a hedge in the interim. The seller will hold long futures contracts, while the buyer will hold short futures. On the date of completion of the sale, the cash commodity is transferred at the agreed price, and the parties' futures contracts are exchanged between them privately. The completion of the cash sale is reported to the contract market or its clearing organization and the futures contracts that were exchanged privately between the parties are simply expunged by the market or its clearing agency.
 
 
 [1]
 P. Johnson, supra, Sec. 2.30, at 263. See also S.Rep. No. 1154, 95th Cong., 2d Sess. 126, reprinted in 1978 U.S.Code Cong. & Ad.News 2083, 2163 (EFP defined as a "transaction in which the buyer of a cash commodity transfers to the seller a corresponding amount of long futures contracts, or receives from the seller a corresponding amount of short futures, at a price difference mutually agreed upon. In this way the opposite hedges in futures of both parties are closed out simultaneously."). As stated by a report prepared by the Secretary of Agriculture, "[t]he rationale given for use of the EFP rule in potatoes is that it allows greater flexibility in delivering potatoes that do not fit contract specifications. This is a plausible interpretation because virtually all EFP transactions have occurred after trading in the contract had ceased and not during the life of the trading." Sen.Comm. on Agriculture, Nutrition, and Forestry, 96th Cong., 1st Sess., Potato Futures Study 142 (Comm. Print 1979) (submitted by the Secretary of Agriculture in compliance with section 27 of the Futures Trading Act of 1978)
 
 
 [22]
 He held alternatively that if bad faith had been sufficiently alleged with respect to both claims, the affidavits disclosed no triable issue of fact and defendants were entitled to summary judgment. 571 F.Supp. at 1561-62
 
 
 [23]
 The Commission does not advocate that an exchange is under a privately enforceable duty to amend its contract to ensure that it provides an optimal hedge for certain traders. Instead, it proposes that the duty should arise when circumstances occur, after it has approved the relevant contract terms, which alert the exchange that its contract should be amended in order to preserve an orderly market
 
 
 [24]
 We see little to be gained by discussing the specific grounds for rejecting Wong's reliance on Secs. 5(a), 5(g) and the applicable CFTC regulations in light of the compelling reasoning contained in the district judge's opinion, see 571 F.Supp. at 1554-55, with which we agree
 Similarly, we are unconvinced, as was the district judge, despite the CFTC's presentation, that an exchange's designation requirement of providing for the "prevention of manipulation of prices and the cornering of any commodity" under Sec. 5(d) encompasses a privately enforceable duty to amend contract rules. Apart from the reason that such a broadening of Sec. 5(d) is untenable given the regulatory scheme established by Congress in the CEA, see infra, we take note that Sec. 5(d) has generally been interpreted as requiring exchanges seeking designation to demonstrate to the CFTC that they have provided against the risks of cornering and manipulation by devising procedures and establishing programs reasonably calculated to detect, curb and punish such misconduct. See 1 P. Johnson, supra, Sec. 1.22, at 77. Moreover, the district judge was surely correct in pointing out that "[p]reservation of the two activities mentioned by Sec. 5(d)--manipulation and cornering--does not necessarily suggest a broad requirement of maintaining an orderly market by preventing disruptions caused by contracts with poor hedging characteristics [i.e., an allegedly defective contract]," 571 F.Supp. at 1557. Indeed, such a suggestion is unwarranted given that Sec. 5(d) states a condition of exchange designation and not an exchange duty.
 
 
 [25]
 We take note of the district court's apt conclusion that the CEA "contemplates that contract revision should occur through initiatives of exchanges, the CFTC, and traders, taken in the administrative process, and enforced through limited judicial review only to the extent that the administrative process leads to the adoption of contract terms legally unsupportable under the Act." 571 F.Supp. at 1554
 
 
 [26]
 The CFTC cites Seligson v. New York Produce Exchange, 378 F.Supp. 1076 (S.D.N.Y.1974), aff'd sub nom. Miller v. New York Produce Exchange, 550 F.2d 762 (2 Cir.), cert. denied, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977), as a case of this sort upon which the Supreme Court "relied" in Curran. What this court affirmed was not the ruling of the district judge denying defendants' motion for summary judgment reported in 367 F.Supp. 1076, on which the CFTC relies, but a subsequent judgment in favor of the defendants, based on directed verdicts on some counts and verdicts on the merits in others. The Supreme Court's inclusion of Seligson in a list of 10 cases holding that an exchange's failure to enforce its own rules was actionable (and again, for a similar purpose, in footnote 95) hardly constitutes "reliance" on a case when the issue of liability for failure to propose new rules ultimately was not presented
 We likewise disagree with the CFTC's statement that "Curran makes clear that Section 5(d) is one of the Act's provisions which had provided and would continue to provide private actions for damages." Brief for the CFTC at 5. The CFTC cites in support of this, "E.g., 456 U.S. at nn. 94, 95 [102 S.Ct. at 1846-1847]." Note 94 is the citation of 10 cases sustaining actions against exchanges, only one of which, to wit, the district court decision in Seligson, gives any support to the theory for which the CFTC contends. Note 95 is a quotation from the Seventh Circuit's opinion in Deaktor v. L.D. Schreiber & Co., 479 F.2d 529, 530 (7 Cir.), rev'd on other grounds sub nom. Chicago Mercantile Exchange v. Deaktor, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973); the quotation refers to an exchange's duty under Sec. 5a(8) to enforce its own rules, as did Leist v. Simplot, supra, 638 F.2d 283, which was decided by the Supreme Court along with Curran, not a duty to establish new ones. The CFTC also notes that "Section 5(d) was one of the provisions relied upon in the Supreme Court by certain of the Curran plaintiffs", citing "456 U.S. at 372 n. 49, 102 S.Ct. at 1836 n. 49 and 388 n. 87, 102 S.Ct. 1844 n. 87 and accompanying text." Brief for the CFTC at 5. In fact the references are to the Leist plaintiffs and the footnotes and text simply reflect the plaintiffs' contentions. The Court's holding was "that exchanges can be held accountable for breaching their statutory duties to enforce their own rules prohibiting price manipulation." 456 U.S. at 394, 102 S.Ct. at 1847.
 
 
 [27]
 When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just
 The Moore treatise states that "[u]nless dilatory or lacking in merit, the motion [under Rule 56(f) ] should be liberally treated." 6 Moore's Federal Practice p 56.24, at 56-1425 to 56-1426 (2d ed. 1982) (footnote omitted). It states further that "absent abuse of discretion, the trial court's determination will not be interfered with by the appellate court," id. at 56-1428, but then lists, in footnote 15, eight cases, most within a short time span, where the appellate court did precisely that.
 
 
 [28]
 We see no basis for Spinale's objection to the admissibility of the factual findings in the CFTC report. Fed.R.Evid. 803(8) excepts from the hearsay rule "Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." We approved the admission of a quite similar report in Miller v. New York Produce Exchange, supra, 550 F.2d at 769, despite the fact that the report, like the one here, also contained conclusory statements. Spinale's claim that certain factual findings, not those relating to the contract positions of Board members, are incorrect, goes only to the weight to be given to the report; even if Spinale is right, the inaccuracies were not so extensive as to require the judge to find lack of trustworthiness
 
 
 [29]
 Chairman Marks had indicated to the CFTC that the Board "did not consider the March contract separately from the April and May [contracts]" when reviewing the market situation and deciding to take emergency action at the March 8-9 meeting
 
 
 [30]
 We agree with Judge Sofaer, 571 F.Supp. at 1540-41, that it is proper, as we have done in earlier portions of this opinion, to consider the 1982 statute despite the non-retroactivity provision of Sec. 22(d), 7 U.S.C. Sec. 25(d). Congress was adopting for a case like this what it thought had been the preexisting law. When, as here, the precise meaning of the bad faith standard as applied prior to the 1982 statute is in doubt, indications of what Congress thought it had meant would be welcome evidence. See Rohauer v. Killiam Shows, Inc., 551 F.2d 484, 494 (2 Cir.), cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977); In re Texlon Corp., 596 F.2d 1092, 1098 (2 Cir.1979)
 
 
 [31]
 The Exchange maintained a "Street Book" containing a record of all transactions on each day. Spinale was given access to the Street Book only for March 8
 
 
 [32]
 By this we mean only a minimal requirement of some basis in reason--not a showing that the emergency action constituted the optimal response. Absent some basis in reason, action could hardly be in good faith even apart from ulterior motive. See 571 F.Supp. at 1553 ("the kind of reckless and virtually irrational exchange action that might independently support an inference of bad faith")
 
 
 [33]
 On the other hand, unless further amendment of the complaint is allowed, Spinale need not be permitted discovery on his theory, apparently developed for the first time at oral argument in the district court, see Transcript of November 24, 1982 Oral Argument at 38-50 (2 Jt. App. at 598-610), that defendants manipulated trading by taking short positions, thereby depressing prices, on the basis of inside information that emergency action was being planned